**FILED**
U.S. DISTRICT COURT
EASTERN DISTRICT ARKANSAS

JUL 2 7 2016

JAMES W McCORMACK, CLERK
By:_____
DEP CLERK

UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF ARKANSAS
LITTLE ROCK DIVISION

DAVID A. STEBBINS                                      PLAINTIFF

VS.                    CASE NO. 16- 4:16cv545-JM

STATE OF ARKANSAS, ARKANSAS
REHABILITATION SERVICES, AND AMY JONES            DEFENDANTS

## COMPLAINT AND JURY DEMAND

Comes now, *pro se* Plaintiff David Stebbins, who hereby submits the following

Complaint and Jury Demand against the above-named Defendants for retaliation in violation of

Sec. 503 of the Americans with Disabilities Act, and for one count of disability discrimination in

the first instance in violation of Sec. 202 of the Americans with Disabilities Act. Plaintiff also

sues Amy Jones for a violation of 42 USC § 1983 for an act of First Amendment Retaliation.

### SECTION I: JURISDICTION AND VENUE

1.     This Court has "federal question" subject-matter jurisdiction. See 28 USC § 1331.

2.     This court has personal jurisdiction and proper venue because at least one of the

Defendants – the State of Arkansas – is headquartered in Little Rock, and all defendants are

residents of the State of Arkansas. See 28 USC § 1391(b)(1).

### SECTION II: SOVEREIGN IMMUNITY

3.     Because this is always a top priority whenever any government agency is being sued in

federal court, let's get this out of the way right now.

4.     There is no Eleventh Amendment immunity in this case. See 42 USC §12202: "A State

shall not be immune under the eleventh amendment to the Constitution of the United States from

an action in Federal or State court of competent jurisdiction for a violation of this chapter. In any

action against a State for a violation of the requirements of this chapter, remedies (including

This case assigned to District Judge Moody
and to Magistrate Judge Ray

remedies both at law and in equity) are available for such a violation to the same extent as such remedies are available for such a violation in an action against any public or private entity other than a State."

5.      This is not unconstitutional. See *Tennessee v. Lane*, 541 U.S. 509 (2004).

6.      Therefore, the Defendants are fully subject to suit in this case.

## SECTION III: FACTUAL ALLEGATIONS

### Sub-Section 1: Plaintiff's Statutorily Protected Activities

7.      Plaintiff – a resident oft he city of Harrison, Arkansas and of Boone County, Arkansas – has Asperger Syndrome, a disability which severely hinders his ability to socialize with others, make friends, get jobs, get a girlfriend, etc.

8.      Because this disability is not obvious (like blindness or paraplegia), many persons do not realize that it even IS a disability, and thus, they believe that they have no obligation under the Americans with Disabilities Act to provide reasonable accommodations for it. This leads to many times when Plaintiffdoes not get the reasonable accommodations he is supposed to be legally entitled to. Thus, Plaintiffwas faced, many many times, with two options: Either suck it up and let people do whatever they want to him and walk all over him, or file suit in federal court. Plaintiff quickly decided that the former was 100% out ofthe question.

9.      Plaintiff could not afford to hire an attorney on an hourly basis, and because discrimination is an extremely complication area oflaw (indeed, the Defendant's mindset is an essential element), it is extremely rare for an attorney to take a case on contingency, especially when the Defendants in those cases honestly believe that they were doing nothing wrong.

10.     Thus, Plaintiff had no choice but to represent himself pro se in these matters.

11.     A non-exclusive list of the ADA cases where Plaintiff represented himself are …

(a)     Case No. 10-3305 in the U.S. District Court for the Western District of Missouri;

(b)     Case No. 10-3041 in the U. S. District Court for the Western Distria of Arkansas;

(c)     Case No. 10-5025 in the U.S. District Court for the Western District of Arkansas;

(d)     Case No. 10-3086 in the U.S. District Court for the Western District of Arkansas;

(e)     Case No. 10-3072 in the U. S. District Court for the Western District of Arkansas;

(f)     Case No. 11-3078 in the U.S. District Court for the Western District of Arkansas;

(g)     Case No. 11-3057 in the U.S. District Court for the Western District of Arkansas;

(h)     Case No. 4:15CV0036 in the U.S. District Court for the Eastern District of Arkansas

### Sub-Section 2: Plaintiff's disabilities

12.     In addition to Aspergers (which he was diagnosed with in fifth grade), Plaintiff was

diagnosed with a slew of new disabilities in April of 2015, including, but not limited to, post

traumatic stress disorder and severe depression. These disabilities were inflicted by various

government officials, who repeatedly persecuted, badgered, and bullied Plaintiff relentlessly,

simply because they could get away with it. However, for purposes of this complaint, these

disabilities (Asperger Syndrome, Depression, and Trauma) are the disabilities that give Plaintiff

the protection of the Americans with Disabilities Act in this case.

### Sub-Section 3: The Adverse Action

13.     The Arkansas Rehabilitation Service (or ARS for short) is an agency run and funded by

the State of Arkansas (or "the State" for short). The State has appointed Amy Jones as manager

of the Northwest Arkansas division of the ARS (which includes Harrison, even though her office

is in Fayetteville).

14.     One of the services the ARS provides is funding, in addition to (not in place of) federal

student aid (e.g. Pell Grants, Stafford Loans, etc.) to college students. All students who qualify at

all are eligible to receive at least $5,300 per year ($5,000 per year for tuition/room/board and

$300 for textbooks) in grants that do not have to be repaid, but the ARS can provide extra funds

for extenuating circumstances, at the manager's discretion, with no maximum amount of funding,

as long as the manager approves it.

15.     In the month of November, 2015, Plaintiff entered the Harrison division of the ARS and

asked to apply for funding to enroll at Arkansas Tech University in Russellville, AR, so he could

major in either Computer Science or Information Technology (he had not yet decided which).

Plaintiff was hoping to move on with life after the multiple years of constant torment at the hands

of government officials. He was hoping to just get a degree, get a job, and then live a normal life.

16.     Plaintiff is, without a doubt, qualified to be a student in college. He has enrolled as a

student before at North Arkansas College in Harrison, where he earned good grades. He never

made a D or an F in any class he took, and will be able to produce a transcript to prove that. One

of his old teachers has since signed a statement claiming that Plaintiff "was a very successful

mathematics[1] student. He has an innate sense of logic, order, and patterns. He wants to major in

computer science and I predict he would excel in that field." Therefore, Plaintiff is,

unquestionably, "otherwise qualified" for this service.

17.     When applying with the ARS, Plaintiff asked for extra funding in the amount of $11,038

per year (for a total of $16,338 per year when you include the default amount), due to the

following extenuating circumstances:

(a)     Plaintiff was already over $40,000 in student loan debt due to a previous college

attempt (which forms the basis of proving that he is "otherwise qualified," as explained in

Paragraph 16 of this Complaint), and thus could not afford to take out any more student

---

[1]   This subject is of special note. Since Plaintiff plans to enter the field of computer science, mathematics is a much better measure of his potential than, say, history or English. Thus, mediocre grades in those types of classes can be overlooked when measuring Plaintiff's academic and vocational potential.

loans.

(b)     Since he does not have a car, he needs extra funding to live on-campus.

(c)     When he moves out of his current apartment, he will not have a home to go back to. Thus, he needs extra funds for summer semester.

(d)     He will also need approximately $500 in extra funds for the first year, to make the one-way trip to Russellville. It will be this expensive because Plaintiff will be taking all his personal possessions with him (since, to repeat from sub-paragraph (c), he will not be returning to Harrison).

18.     Since then, ATU's tuition has increased, and therefore, so has the amount of money Plaintiff needs to fund his new college education.

19.     After about thirty (30) days, Plaintiff received the answer to his application. Strangely, Plaintiff himself received only part of the answer, while the rest of it was sent to the pro bono law firm of Disability Rights Arkansas (this is weird because, if they felt that Plaintiff had retained that law firm, why would they send Plaintiff *anything* directly? As a government agency, wouldn't they know the ethical importance of serving *only* the attorney?).

20.     However, as you may have guessed (since Plaintiff would not be filing suit otherwise), Plaintiff was rejected for services when Amy Jones issued the order that his case be closed.

### Sub-Section 4: The Causal Connection

21.     While Plaintiff's application was pending, the ARS requested that Plaintiff release his medical records from the past three (3) years. Plaintiff stated that he only had medical records from two places, and both were from less than a year prior: A hospital visit at St. Bernard's Health Center in Jonesboro, AR, and a "follow-up" to that trip when Plaintiff was discharged, which he completed at Health Resources of Arkansas in Harrison.

22.     Plaintiff provided release forms for the records for these two places, and these records

were used by the Defendants as the basis for the denial of services, stating, in pertinent part, that

their "Licensed Psychological Examiner" has recommended that Plaintiff obtain a theraputic

relationship to alleviate the symptoms they feel would interfere with Plaintiff's vocational efforts.

23.     It is worth nothing that this alleged "Licensed Psychological Examiner" never once spoke

two words with Plaintiff over the phone, let alone invited Plaintiff into his clinic to perform a

competent psychological evaluation. Thus, it is almost certain that this doctor pre-judged

Plaintiff's psychological state and did not base his diagnosis on any symptoms that he personally

observed (since he never personally observed *any* symptoms).

24.     When ARS served Disability Rights Arkansas with a portion of the rejection papers, those

papers contained the following statements:

> "A search of public records revealed multiple lawsuits filed by Mr. Stebbins
> against his parents, Wal-Mart, the U of A, and federal judges. Causes of action
> were mainly civil rights and discrimination.
>
> …

### VOCATIONAL IMPLICATIONS

> Following is a list of ways in which the individual's observed or reported problem
> areas are likely to be manifested in a vocational setting.
>
> IMPULSIVITY MAY RESULT IN POOR CHOICES IN JOB ENVIRONMENT
> DEPRESSION MAY INTERFERE WITH COUNSELING/JOB INTERVIEWS
> MAY BE SOURCE OF DISTRACTION TO CO-WORKERS
> DIFFICULTY ASSESSING CONSEQUENCES OF DECISION
> ALTERNATIVES
> DIFFICULTY RELATED WITH INSTRUCTORS/STUDENTS/CO-WORKERS
> DIFFICULTY PERFORMING WORK TASKS WHICH INVOLVE PEOPLE
> DIFFICULTY CHANGEING BEHAVIOR TO MEET REQUIREMENTS
> EMOTIONAL INTENSITY MAY INTERFERE WITH TASK PERFORMANCE
> CONFLICTS MAY PRECLUDE ADEQUATE TASK PERFORMANCE"

25.     Thus, the Defendants have openly confessed to denying Plaintiff access to government

services on the basis of (A) Plaintiff's statutorily protected activities (which they knew, full well, to be statutorily protected, because of the language that was underlined above for emphasis), and (B) because of a perceived disability. Not even the slightest efforts were made to provide reasonable accommodations or to determine if this specific incident of the disability would have, in fact, gotten in the way of Plaintiff's educational success.

26.     All the symptoms listed in the rejection papers are symptoms of the three disabilities mentioned in Paragraph 12 of this Complaint.

27.     Thus, the element of causal connection is established by the Defendant's own admission.

### Sub-Section 5: The Lack of Affirmative Defenses

28.     Under most circumstances, the District Court must view the factual allegations of a Plaintiff's complaint in a light most favorable to the Plaintiff. However, an exception is made when the Plaintiff's factual allegations show a valid affirmative defense on the face of the complaint. See *Hafley v. Lohman*, 90 F. 3d 264, 266 (8th Cir. 1996). Thus, Plaintiff would like to take this opportunity to quell any potential affirmative defenses he might have alluded to in the above sections.

29.     Based on the grounds for their denial, it appears that their most likely affirmative defenses are (A) direct threat, and (B) bona fide qualification. Neither of these affirmative defenses would have merit.

30.     First of all, neither of these defenses are even arguably applicable, in the first instance, to the charge of retaliation. Since Plaintiff's statutorily protected activities clearly formed at least half the basis for their rejection, they are left entirely without any excuse whatsoever for that claim, even if they might have dismissed the claim of Title II disability discrimination in the first instance. The Defendants are still liable anyway.

31.     Second, even concerning the claim of Sec. 202 of the ADA, these defenses still fall short. Remember that the Defendants did not actually examine Plaintiff, and instead based their rejection entirely on speculation and conjecture as to what they believed Plaintiff's symptoms "might" cause. They did not even base their rejection on what they thought the symptoms "would" cause … just on what they felt the symptoms "might" cause. As we will soon see in the next section (Section V: The Law), repeated and consistent precedent from the Eighth Circuit and the United States Supreme Court has explained that this approach is patently insufficient under the ADA. Thus, both of these defenses – even if relevant to the claim – still fail on the merits.

### Sub-Section 6: Actual and Future Damages

32.     First of all, the most obvious injury Plaintiff has suffered is the inability to enroll in college.

33.     However, if Plaintiff prevails on this claim, he would also be entitled to recover wages for the loss of employment. After all, if his college education is delayed, it stands to reason that his obtaining of an entry-level position that uses this degree will also be delayed. Thus, if Plaintiff prevails either of his two claims, he should be entitled to also recover 1-2 years worth of lost wages.

34.     Lastly, Plaintiff should be allowed to recover punitive damages if he can prove discriminatory intent. While Title III of the ADA expressly prohibits the recovery of punitive damages, no such language is present in Title II. In fact, the complete opposite seems to be the case. But more on that in the next section, when we start talking about the law.

### SECTION IV: THE LAW

### Sub-Section 1: Prima Facie Showing of Discrimination

35.     To make a valid prima facie case of disability discrimination, Plaintiff must sufficiently

allege the following facts: (A) That Plaintiff is disabled, (B), that Plaintiff is, but for the

disability, otherwise qualified for a particular service, (C) That Plaintiff was denied the service

specified above, and (D) that the denial was based, at least in part, because of the Plaintiff's

disability. See *Wooten v. Farmland Foods*, 58 F. 3d 382, 385 (8th Cir. 1995).

36.     As of the ADA Amendments Act of 2008, the Plaintiff does not have to actually have a

disability in order for Essential Element (b) to be satisfied. As long as the Defendants believe

that Plaintiff has a disability, he is considered "disabled" for purposes of being entitled to

recovery under disability discrimination. See 42 U.S.C. § 12102(1)(C).

37.     Plaintiff has these three disabilities and has the medical records to prove them. Also, the

ARS believes Plaintiff has these disabilities. Therefore, Essential Element (A) is established in

two different ways.

38.     The factual allegations in Paragraph 16 of this Complaint are sufficient to establish

Essential Element B.

39.     Paragraph 20 sufficiently pleads that Plaintiff was subjected to an adverse action from the

Defendants. Thus, Essential Element C has been sufficiently plead.

40.     Paragraphs 21-27 sufficiently plead that the Defendants not only engaged in the adverse

action because of the disabilities, but never made any attempt to hide their discriminatory intent.

Thus, Essential Element D has been adequately plead.

41.     Therefore, Plaintiff has sufficiently plead sufficient facts to be entitled to relief on a claim

of Title II disability discrimination.

### Sub-Section 2: Prima Facie Showing of Retaliation

42.     "In order to establish a prima facie case of retaliation, a plaintiff must show (1) that he

engaged in a statutorily protected activity, (2) that an adverse action was taken against him, and

(3) a causal connection between the adverse action and the protected activity." See *Amir v. St. Louis University*, 184 F. 3d 1017, 1025 (8th Cir. 1999).

43.    For the first essential element, the factual allegations of Paragraphs 11(a)-11(h) are almost sufficient to establish that Plaintiff has engaged in statutorily protected activities. However, "[a] person cannot show that he engaged in a statutorily protected activity without first demonstrating that he had a good faith reasonable belief that the alleged retaliator was engaging in discriminatory activity." See *id*. Fortunately, the factual allegations contained in Paragraphs 7-10 sufficiently pleads that Plaintiff had a good faith reasonable belief that the defendants in those cases were engaging in discriminatory activity. Therefore, the first of these essential elements has been sufficiently plead.

44.    The second essential element – the adverse action – is the same adverse action as stated in Paragraph 39 of this Complaint. The fact that Plaintiff was denied ARS funding is the adverse action in this complaint.

45.    The third and final essential element – causal connection – is also sufficiently plead. You can tell, from the first portion of the quotation in Paragraph 24 (the two sentences before the ellipsis) that the Defendants went out of their way to look up Plaintiff's litigation history – despite it having no bearing whatsoever on whether Plaintiff was ready to return to college after a multi-year absence – for the express purpose of using it as a basis for denying Plaintiff their services. Once Plaintiff produces a verbatim copy of this rejection letter, this court may have no choice but to issue summary judgment in the Plaintiff's favor, since they are not even trying to hide their retaliatory intent.

### Sub-Section 3: Prima Facie Showing of First Amendment Retaliation

46.    "To establish a First Amendment retaliation claim under 42 U.S.C. § 1983, the plaintiff

must show (1) he engaged in a protected activity, (2) the government official took adverse action

against him that would chill a person of ordinary firmness from continuing in the activity, and (3)

the adverse action was motivated at least in part by the exercise of the protected activity. In brief,

the plaintiff must show the official took the adverse action because the plaintiff engaged in the

protected speech." See Revels v. Vincenz, 382 F. 3d 870, 876 (8th Cir. 2004).

47.     Plaintiff's lawsuits – even those that are not discrimination cases – are protected by the

First Amendment. See *California Motor Transport Co. v. Trucking Unlimited*, 404 US 508

(1972) ("The right of access to the courts is indeed but one aspect of the right to petition").

48.     Since Amy Jones' adverse actions were clearly motivated by Plaintiff's first amendment

exercises (see the above sub-section on ADA retaliation), the other two essential elements are

also not in dispute.

### Sub-Section 4: The Burden of Proof

49.     In most discrimination or retaliation cases, the Defendant will usually allege a

nondiscriminatory reason for their adverse action, and then the burden of proof shifts to the

Plaintiff to show that this nondiscriminatory reason is pretextual. In the instant case, however,

this is not the case. The Defendants have made no effort to hide their discriminatory and

retaliatory intent behind their rejection of services. Thus, no showing of pretext is necessary.

50.     Instead, the burden falls onto the Defendants to plead – and then subsequently prove – an

affirmative defense to these two claims.

51.     As stated before, the closest the Defendants have to an affirmative defense are that

Plaintiff's disabilities make him truly unqualified. In other words, if there was a Title II

equivalent to "bona fide occupational qualification," this is the defense they would be alleging.

52.     However, the Defendants will hold the burden of proof on this defense. See *Automobile*

*Workers v. Johnson Controls, Inc.*, 499 US 187, 200 (1991) ("For the plaintiff to bear the burden of proof in a case in which there is direct evidence of a facially discriminatory policy is wholly inconsistent with settled [discrimination] law").

53.     In terms of ADA law, specifically, there is ample precedent stating that discrimination on the basis that your symptoms get in the way of your job performance is allowed, but only if the plaintiff is actually hindered. The Defendants don't get to just *assume* that a person's symptoms could get in the way; they must prove that they *will* get in the way.

54.     The most famous of these precedents is the SCOTUS case of School Bd. of Nassau Cty. v. Arline, 480 US 273 (1987), which states that decisions to exclude disabled persons from services on the grounds that their disabilities could get in the way must be based on an "individualized inquiry" into the disabled person's specific abilities, and must be "based on reasonable medical judgments given the state of medical knowledge."

55.     Then there is the case of EEOC v. Wal-Mart Stores, Inc., 477 F. 3d 561, 571 (8th Cir. 2007), which states in pertinent part that there must be "analysis that relies on the 'best current medical or other objective evidence' in order to 'protect disabled individuals from discrimination based on prejudice, stereotypes, or unfounded fear.'"

56.     They must also consider whether any reasonable accommodations might enable Plaintiff to be in school/work, despite these symptoms. "If a reasonable accommodation could eliminate the risk [or barrier], entities covered under [the FHA] are required to engage in such accommodation." See Radecki v. Joura, 114 F. 3d 115, 117 (8th Cir. 1997) (citing School Bd. of Nassau Cty. v. Arline).

57.     Since the ARS's psychological examiner never examined Plaintiff in the first instance (see Paragraph 23 of this Complaint), then they have automatically failed to satisfy even the first

essential element of this defense. Thus, this defense is out of the question, right out of the gate. Furthermore, since they never even *considered* the possibility of reasonable accommodations, that is another essential element of the defense that they have failed to meet.

58.     Thus, the Defendants have no affirmative defense to their discrimination. Since they have admitted to the elements for a prima facie claim of discrimination, as well as retaliation, that means that they are stuck being liable.

## SECTION V: DAMAGES AND RELIEF REQUESTED

59.     First of all, Plaintiff requests injunctive relief. This injunction should extent, not just to the ARS, but also to the State of Arkansas. Plaintiff asks that the State of Arkansas, in its entirety, be ordered to permanently and perpetually cease and desist its constant, repeated, never-ending pattern of discrimination and retaliation against him. If any officer of the State of Arkansas, or any local government within the State, is ever found to have engaged in any disability discrimination, or retaliation against Plaintiff for his statutorily protected activities, ever again, regardless of the circumstances or context, Plaintiff asks that the State be held in contempt of court for violating this injunction.

60.     Second, Plaintiff asks for injunctive relief, ordering the Arkansas Rehabilitation Services to provide funding for all of Plaintiff's college expenses in the first instance. Plaintiff requested extra funds for room and board, travel to Russellville, and summer semesters. Normally, providing extra funding for these things would be within Amy Jones' discretion. However, if Plaintiff can prevail on either the retaliation or discrimination claims in the first instance, then it will be proven that Jones cannot be trusted to use her discretion impartially and without discrimination. Thus, just like when Guy Amir (the plaintiff in the aforementioned case of Amir v. St. Lous University) requested an injunction ordering his teachers to pass him, even if they

might have had other grounds to flunk him within their discretion without the retaliation, Plaintiff in this case requests an injunction ordering the ARS to grant all of Plaintiff's requests for extra fund.

    (a)    An exception can be made for all future funds requests that are not reasonably related to Plaintiff's college education, and/or that are patently frivolous.

    (b)    Please note that this is not merely damages in the amount of $11,038, as stated above. Because as Plaintiff stated, the cost of tuition, room, and board at ATU has since gone up, and it will likely go up again next year … and the next. The skyrocketing of the costs of a college education is currently an epidemic making national headlines.

    (c)    This is not an injunction to simply pay only the money Plaintiff has requested, but rather, to pay ALL of Plaintiff's college education costs, in the first instance, except for what Plaintiff can obtain in Pell Grants. This is necessary because, as stated above, Amy Jones cannot be trusted to avoid discrimination or retaliation in her discretionary duties. This injunction would necessarily require that they provide more funds each year, as the costs of education go up.

61.    Plaintiff also requests damages in the amount of $148,907.50 for two years worth of lost wages. Plaintiff could have enrolled in college as early as Spring of 2016 had the Defendants not engaged in discrimination and retaliation. Because his enrollment is being delayed, so too is his earnings potential. Plaintiff has investigated online and discovered that the average entry-level positions for computer science majors comes out to an average of $74,453.75 per year. By the time it takes this case to work its way through the court system, it will likely be around the Fall of 2017, which means that Plaintiff will likely have the funds to enroll in Spring of 2018, two years later than it would have been if the ARS had not engaged in retaliation or discrimination.

62.     This request for damages is allowed under the precedent of *Meagley v. City of Little Rock*,
639 F. 3d 384 (8th Cir. 2011). Since the Defendants have admitted, in writing, that they rejected
Plaintiff specifically because of his statutorily protected activities and symptoms they knew were
caused by disability, this suffices to show discriminatory & retaliatory intent. Therefore, Plaintiff
is entitled to recover damages under the *Meagley* precedent.

63.     Plaintiff also requests $595,630 – or four times the amount of damages – in punitive
damages. Sec. 203 of the Americans with Disabilities Act – which governs the remedies and
penalties for a violation of Title II thereof – states that the remedies and penalties are the same as
those for *employment* discrimination under the Rehabilitation Act. Employment discrimination
allows the recovery of punitive damages, and therefore, they are also recoverable in this case.

64.     The lost wages and punitive damages, together, comes out to a total of $744,537.50. This
is in addition to the monetary value of the injunctions requested in Paragraphs 56 and 47 of this
Complaint.

## SECTION VI: JURY DEMAND

65.     If a trial is needed to determine any facts, Plaintiff demands that the trial be by a jury of
his peers.

## SECTION VIII: CONCLUSION

66.     Wherefore, premises considered, Plaintiff respectfully requests that all the relief
requested in Section V of this Complaint be granted, costs incurred be awarded, and any other
relief to which he may be entitled.

67.     So requested on this, the 18th 25th day of July, 2016.

David Stebbins
123 W. Ridge St.,
APT D
Harrison, AR 72601
870-204-6516
stebbinsd@yahoo.com